# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **STEVEN M. MAXWELL,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03 C 5715 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **VERTICAL NETWORKS, INC.,** | ) | |
| a California corporation; **ALAN FRASER,** | ) | |
| a California resident, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Steven M. Maxwell, filed a six-count complaint against Defendants, Vertical

Networks, Inc. ("Vertical") and Alan Fraser, alleging breach of contract, unjust enrichment, and

violation of the Illinois Wage Payment and Collection Act ("Illinois Wage Act") by Vertical, and

violation of the Illinois Wage Act and tortious interference by Fraser. Vertical and Fraser have

moved for summary judgment on all five remaining counts[1] pursuant to Rule 56 of the Federal

Rules of Civil Procedure. Federal diversity jurisdiction exists in this case, as the parties to each

count are completely diverse and the controversy exceeds $75,000. 28 U.S.C. § 1332(a). The

parties have consented to have this Court conduct any and all proceedings in this case, including

the entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(a). The Court finds that

Illinois law applies in this case and the parties rely on Illinois law in their briefs and arguments.

---

[1] Count IV of Plaintiff's complaint was previously dismissed.

For the following reasons, Vertical and Fraser's motions for summary judgment on all five remaining counts are granted.

# I.  Background

## A.  The Parties

Vertical is a California corporation with its principal place of business in California. Vertical manufactures and sells a telecommunications product–InstantOffice™–to business offices, including business offices in Illinois. At all relevant times, Fraser, a California resident, was Vertical's President and Chief Executive Officer. Plaintiff, an Illinois resident, was employed by Vertical as an Enterprise Network Consultant from March 15, 1999, to October 2, 2002. Plaintiff's responsibilities included providing technical assistance to his sales team partner, Peter Weyant, and to potential and actual customers, as he and Weyant solicited sales and service customers within their assigned region. Specifically, Plaintiff and Weyant were charged with selling Vertical's products in the company's "north-central territory" through distributors such as AT&T. At all times, Plaintiff was an at-will employee of Vertical.

## B.  Plaintiff's Compensation

Plaintiff's compensation was based on the terms of his Enterprise Network Consultant Compensation Plans. These compensation plans were formal, written agreements between Vertical and Plaintiff and set out Plaintiff's base salary as well as incentive commissions and bonuses designed to encourage Plaintiff to generate new and more sales. Plaintiff's annual sales quotas varied from year to year, as Vertical considered Plaintiff's projected sales and prospects

- 2 -

for the coming year when setting his quotas. Plaintiff is challenging his compensation under his 2001 and 2002 compensation plans.

### 1. 2001 Compensation Plan

For the significant portion of 2000, Plaintiff and Weyant worked on a substantial sales opportunity to Household Finance Corporation ("Household"). In April 2000, Plaintiff and Weyant went to Household's headquarters to demonstrate and market Vertical's products and capabilities. In June 2000, Plaintiff and Weyant held meetings with AT&T to obtain additional details about the Household account and to discuss what AT&T's focus should be to get Household's attention. Plaintiff and Weyant continued to cultivate their relationship with Household through June 2000. By July 2000, the Household deal had moved beyond the weed-out stage and was in Vertical's "pipeline." According to Vertical and Fraser, a deal in the "pipeline" could be viewed as a legitimate potential deal for the company. (Vertical's Mem. Supp. Mot. Summ. J. at 3.) In July 2000, Plaintiff was spending approximately ten to fifteen percent of his time on the Household deal. By August 2000, Plaintiff was spending about twenty to twenty-five percent of his time on the Household deal. By October 2000, Plaintiff was apparently spending at least half (but possibly as much as seventy-five percent) of his time working to close the Household deal. Despite Plaintiff's efforts, Vertical did not close the sale with Household in calendar year 2000. At the end of 2000, Vertical estimated that the Household deal would result in a sale price upwards of fourteen or fifteen million dollars in 2001.

In January 2001, Fraser held a meeting with Mr. Benjamin A. Alves, Vertical's Vice President of Services and Consulting (and responsible for managing the network consultants sales employees), and Ms. Courtney Mares, Vertical's Director of Human Resources, to discuss the base 2001 compensation plan that was to be distributed to all of Vertical's network consultants in January 2001. During that meeting, Fraser, Alves and Mares also discussed Plaintiff's personal 2001 compensation plan ("2001 Plan"), including applying a sales quota and compensation structure that accounted for the Household opportunity. According to Fraser and Alves, a decision was made to exclude the Household deal from Plaintiff's compensation plan altogether in order to avoid setting extremely high sales quotas that Plaintiff could never attain if the Household deal fell through. (Alves Dep. at 156-58; Fraser Dep. at 73-74.) Fraser, Alves and Mares contemplated compensating Plaintiff for the Household deal under a separate arrangement. (Id.) Plaintiff claims he was never presented with these options nor advised that the Household deal was deemed outside of his compensation plan. (Pl.'s Resp. L.R. 56.1 ¶ 77.) Ultimately, Alves and Mares drafted Plaintiff's 2001 Plan with input from Fraser.

Alves distributed the standard base compensation plan to Plaintiff and the other network consultants on January 19, 2001. The base compensation plan for 2001 provided for "over quota commissions," i.e., incentive commissions, in the event that a network consultant met his monthly, quarterly and annual revenue targets, as well as new account bonuses. (Pl.'s L.R. 56.1 at Ex. C, MAX 0003.) Significantly, under the 2001 Plan, Vertical retained the right to modify or adjust network consultants' (including Plaintiff's) incentive compensation at any time. (Pl.'s L.R. 56.1 at Ex. C, MAX 0006-07.) Plaintiff admits that he understood and signed this document. (Maxwell Dep. at 238-39.)

- 4 -

On February 2, 2001, Plaintiff received a Memorandum of Understanding from Alves containing Plaintiff's personal sales quotas for 2001. According to the terms of this memorandum, Plaintiff's annual quota for 2001 was set at two million dollars. (Pl.'s L.R. 56.1 at Ex. C, MAX 0010.) The memorandum states that Plaintiff's compensation will be assessed and paid out on a monthly basis and lists Plaintiff's revenue goals for the second half of 2001. (Id.) The memorandum also states, "I will communicate any modifications to the revenue numbers with as much advance notice as possible." (Id.) Plaintiff's 2001 Plan was executed by Plaintiff and Alves on February 2, 2001.

Vertical and Fraser argue that Plaintiff's 2001 Plan did not incorporate the Household deal. Alves claims that, in early February 2001, he spoke with Plaintiff and explained that the Household deal would be treated separately from the standard network consultant compensation plan. (Vertical's Mem. Supp. Mot. Summ. J. at 5.) According to Vertical and Fraser, the decision to treat Household separately was further clarified in e-mails sent to Plaintiff on February 8, 2001, and October 26, 2001. While Fraser denies playing an active role in preparing Plaintiff's compensation plan, it appears that Fraser was at least notified of the October 26, 2001 e-mail and the modifications to Plaintiff's 2001 Plan contained therein on October 24, 2001, two days before that e-mail was sent. (Pl.'s L.R. 56.1 at Ex. Q.) For his part, Plaintiff does not recall meeting with Alves in February 2001 and denies that he was told the Household deal would be treated separately from his compensation plan. (Maxwell Dep. at 261-65.) Plaintiff does not deny that Alves sent the February 8, 2001 e-mail but claims that he never received it. Plaintiff claims that the October 26, 2001 e-mail was the first time he learned that Vertical intended to treat the Household deal as outside of his 2001 Plan. Plaintiff claims that he was baffled by

- 5 -

Alves' references to prior discussions in the October 26, 2001 e-mail. For the purposes of this motion, Vertical and Fraser accept these statements by Plaintiff as true. (Vertical's Mem. Supp. Mot. Summ. J. at 5 n.5.)

The Household deal closed on July 2, 2001. Under the terms of the deal, Vertical received a purchase order for about $8.8 million from Household. After the deal closed, Household made an additional fifteen million dollar equity placement in Vertical. All of the parties acknowledge that the Household deal was a very large and very difficult sale and that Vertical faced strong competition from its rivals. The Household deal was the largest sale Vertical had ever made and Household became Vertical's first large customer. Alves recognized that Plaintiff played a pivotal role in the Household deal and, in a June 28, 2001 e-mail to all Vertical employees, he congratulated Plaintiff and Weyant for their role in the deal. While Vertical did not include Household in Plaintiff's 2001 Plan, Plaintiff did receive some incentive compensation for the deal. (Phillips Dep. at 35-37.) Specifically, Vertical paid Plaintiff a new account bonus of approximately $37,500.00 and additional bonus and commission payments of $23,750.00. Plaintiff contends that he is still owed $188,788.00 under the 2001 Plan.

### 2. 2002 Compensation Plan

On February 21, 2002, Plaintiff signed his 2002 compensation plan ("2002 Plan"), which covered the six month period of January 1, 2002, through June 30, 2002. The 2002 Plan was drafted by Mares with input from Alves and Fraser. (Def.'s Resp. L.R. 56.1 ¶ 81.) The 2002 Plan provides for variable payments relating to the plan's six month sales quota targets, based on Plaintiff's level of "Quota Achievement." Under the 2002 Plan, "Quota Achievement" is defined

as "[t]he amount of net shipments generated from sales in specific accounts and/or territories." (Pl.'s L.R. 56.1 at Ex. D, MAX 0021.) "Net shipments" are defined as the net of "the dollar value of shipments on units shipped and invoiced by Vertical Networks during a specified month" less any customer credits and returns during the following thirty day period. (Pl.'s L.R. 56.1 at Ex. D, MAX 0025.) Significantly, under the 2002 Plan, Vertical retained the right to modify or adjust the incentive compensation at any time. (Pl.'s L.R. 56.1 at Ex. D, MAX 0026-27.)

During the six month period covered by the 2002 Plan Plaintiff was involved in the sale of a $1.4 million software license. Specifically, the $1.4 million sale involved Vertical's sale of a software subscription to Household which entitled Household to access future software updates for the next five years, to be used in connection with the InstantOffice™ products that Household had purchased in 2001. Plaintiff admitted that the sale did not involve the shipment of any units but claimed, nonetheless, that the sale entitled him to certain commission payments, namely a variable payment on his six month quota target and an "over-quota" achievement amount. While Vertical and Fraser now deny Plaintiff's claim on the ground that the subscription sale did not involve the shipment of any units, in 2002 Vertical decided to credit Plaintiff with the $1.4 million sale over a sixty month period (corresponding with the manner in which Vertical was recognizing the revenue for accounting purposes). This resulted in credits of approximately $23,000 per month towards Plaintiff's sales quotas. On June 2, 2002, Plaintiff sent an e-mail complaining about his compensation under the 2002 Plan. Plaintiff received three of the $23,000 per month credits before he was terminated by Vertical on October 2, 2002, due to a reduction in work force. The parties dispute whether Vertical's actions, before, during or after the January 1, 2002, to June 30, 2002 period, somehow modified the terms of the 2002 Plan.

- 7 -

## C.    Procedural History

On August 14, 2003, Plaintiff filed his six-count Complaint against Vertical and Fraser. Counts I and II allege breach of contract claims against Vertical with regard to the 2001 and 2002 Plans, respectively. Counts III and IV allege quantum meruit/unjust enrichment claims against Vertical with regard to the 2001 and 2002 Plans, respectively. Count V alleged violation of the Illinois State Representative Act against Vertical but was later dismissed by joint stipulation. Count VI alleges violation of the Illinois Wage Act by Vertical and by Fraser in his individual capacity. Count VII alleges tortious interference with contracts, namely Plaintiff's 2001 and 2002 Plans, by Fraser. Plaintiff's sales team partner, Weyant, filed an identical complaint against Vertical and Fraser a few weeks before Plaintiff. In that companion case, Weyant made the same claims and was represented by the same counsel as Plaintiff. Fraser moved to dismiss Weyant's claims arguing lack of personal jurisdiction. At that time, Fraser gave deposition testimony and complied with personal jurisdiction interrogatories and personal jurisdiction document requests pertaining to his personal contacts with the State of Illinois. Plaintiff, Vertical and Fraser agreed to stay their litigation and await the outcome of Fraser's motion to dismiss Weyant's claims. On February 3, 2004, Fraser's motion to dismiss Weyant's claims for lack of personal jurisdiction was denied. *Weyent v. Vertical Networks, Inc.*, No. 03 C 4214, 2004 WL 421745, at *3-4 (N.D. Ill. Feb. 3, 2004).[2] Though *Weyent* survived the motion to dismiss, that case is no longer alive.

On October 6, 2004, Vertical and Fraser moved for summary judgment with regard to all of Plaintiff's remaining counts against them. Plaintiff responded to these motions on

---

[2] Weyant is spelled differently in *Weyent v. Vertical Networks, Inc.*, No. 03 C 4214, 2004 WL 421745 (N.D. Ill. Feb. 3, 2004). In the case at bar, the parties' briefs refer to Plaintiff's sales team partner as Weyant so the Court chooses to use that spelling in this opinion.

December 1, 2004, and Vertical and Fraser filed reply briefs on January 10, 2005. The Court heard oral argument on Vertical and Fraser's summary judgment motions on January 31, 2005.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship*, 209 F.3d 678, 683 (7th Cir. 2000). In determining whether summary judgment is appropriate, the Court must view the evidence, and draw all reasonable inferences therefrom, in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Kennedy v. United States*, 965 F.2d 413, 417 (7th Cir. 1992). However, if the non-movant bears the burden of proof on an issue he or she may not simply rest on the pleadings, but rather must affirmatively set forth specific facts establishing the existence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 322-26.

Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. If taking the record in its entirety cannot lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial and summary judgment must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## B.    Claims Against Vertical

### 1.    Count I

In Count I, Plaintiff alleges that Vertical breached the 2001 Plan and Memorandum of Understanding when it excluded the Household deal from the compensation arrangements set out in those documents. According to Plaintiff, Vertical owes him $188,788.00 under the 2001 Plan because he exceeded his 2001 quota target and earned both a monthly and quarterly revenue achievement bonus. Vertical rejects Plaintiff's claims and argues that, per the express language of the 2001 Plan, Vertical had the power to modify the 2001 Plan at any time so there was no enforceable contract with regard to bonuses and Plaintiff has no right to claim guaranteed commission payments. Vertical claims that such changes and modifications to the 2001 Plan were made in conversations and e-mails to Plaintiff in February and October 2001.[3]

---

[3] The February 8, 2001 e-mail is addressed to Plaintiff and states:

Based on the inability to get the Household account closed in 2000, the compensation plan for you in 2001 will vary from the standard enterprise NC compensation plan. You will continue to have a base-level quota ($2M), as other enterprise NCs, but will be paid according to the following:

> Based on closure of Household account in 2001,
> 1. Achieve 100% of annual variable bonus
> 2. Achieve new account bonus per schedule in NC comp plan

> Peter [Weyant] has a similar plan as well to keep both of you motivated on the same goals . . . .

Ben [Alves]

(Defs.' L.R. 56.1 at Ex. L.) And on October 26, 2001, Alves sent Plaintiff an e-mail that began:

I wanted to finalize our discussion regarding the overall compensation ramifications of the Household opportunity for you. Your annual quota of $2M

(continued...)

- 10 -

In order to succeed on his claim for recovery of bonus commissions Plaintiff must show that the 2001 Plan was an enforceable employment contract that granted him the right to the commissions. Under Illinois law, a document may form an employment contract only where a three-part test is met: (1) the document contains a promise clear enough to support a reasonable belief that an offer has been made; (2) the document has been disseminated to the employee in a manner that ensures that the employee is aware of the contents and reasonably understands it as an offer; and (3) the employee accepts the offer by commencing or continuing work for the employer. *Robinson v. Ada S. McKinley Cmty. Servs., Inc.*, 19 F.3d 359, 360-61 (7th Cir. 1994). *See also Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 318 (Ill. 1987). The three-part test is evaluated under an objective standard, so the employee's subjective beliefs are not considered. *Rakos v. Skytel Corp.*, 954 F. Supp. 1234, 1237-38 (N.D. Ill. 1996) (citing *Evans v. Gurnee Inns, Inc.*, 645 N.E.2d 556, 559-60 (Ill. App. Ct. 1994)).

According to the plain language of the 2001 Plan, Vertical clearly retained the right to modify and adjust Plaintiff's incentive compensation at any time. The "Plan Rules and Regulations" section of the 2001 Plan includes the following clauses:

> a.      This plan is not an employment contract or guarantee of employment between you and Vertical Networks. Your employment at Vertical Networks is

---

[3](...continued)

for FY2001 was set already knowing that the Household deal was well down the path and in process, so that Household revenue was not included as part of you [sic] base annual quota. . . .

Rather, the original understanding was that the revenue accelerators and quarterly overachievement bonuses would be based on the $2M annual quota you earned on revenue outside of that revenue from Household.

(Defs.' L.R. 56.1 at Ex. N.)

"at will" of Vertical Networks management as outlined in the "Employee Guidelines."

\* \* \*

e.      Vertical Networks reserves the right to make any adjustments or revisions to your target incentive compensation, or any element of the plan at any time without prior notice.

f.      Vertical Networks management reserves the right to withhold or reduce compensation to a level appropriate, in its sole judgement, to a level commensurate with your involvement in the commissionable opportunity.

(Pl.'s L.R. 56.1 at Ex. C, MAX 0006-07.) Plaintiff reviewed and understood these terms when he agreed to the 2001 Plan. (Maxwell Dep. at 238-39.)

The disclaimers contained in the 2001 Plan effectively bar Plaintiff's breach of contract claims because, where an employer retains the right to make unilateral modifications to the plan at any time, there can be no reasonable belief that an offer was made with regard to the incentive compensation. *See Schultz v. Sallie Mae, Inc.*, No. 99 C 3613, 1999 WL 988772, at \*2-3 (N.D. Ill. Oct. 28, 1999); *Rakos*, 954 F. Supp. at 1237-38; *Grottkau v. Sky Climber, Inc.*, No. 93 C 6277, 1995 WL 32611, at \*21 (N.D. Ill. Jan. 26, 1995) (granting summary judgment where employer has total discretion over all matters relating to bonus plan because an employee cannot have a reasonable expectation to a bonus). In *Rakos*, an at-will employee's compensation bonus for a major sale was not calculated according to the compensation plan so the employee sued his employer for breach of contract and Illinois Wage Act violations. 954 F. Supp. at 1237. The *Rakos* court granted the employer's motion for summary judgment because the compensation plan did not create an enforceable contract as a matter of law where the employee lacked a clear right to bonus commissions. *Id.* at 1237-38. Specifically, the *Rakos* court found that, where the

- 12 -

employer retains the right to modify or cancel the compensation plan at anytime there can be no promissory intent and no binding contract. *Id.* In *Schultz*, an employee sued her employer for breach of contract when she received a significantly smaller bonus than the bonus she believed she was entitled to under her compensation plan. 1999 WL 988772, at *1. The *Schultz* court granted the employer's motion to dismiss because the employee could not reasonably believe that she had enforceable rights in a compensation plan that reserved to her employer the power to modify or terminate the plan at any time. *Id.* at *2-3. Similarly, in *Grottkau* the court found that, where the employer reserved the right to modify or cancel the employee's incentive plan, the plan did not contain a clear promise of a bonus and the employee could not reasonably believe that a bonus offer had been extended. 1995 WL 32611, at *21. That court went on to grant the employer's motion for summary judgment on the employee's breach of contract claim. *Id.* In this case, Vertical clearly retained the right to modify or cancel Plaintiff's compensation plans at any time. Therefore, no contractual rights were created by the 2001 Plan and Plaintiff cannot reasonably believe that he has enforceable rights in the 2001 Plan. Furthermore, even if Plaintiff could enforce the 2001 Plan, Vertical was within its rights to unilaterally modify Plaintiff's compensation, so no breach of contract occurred. *See Rakos*, 954 F. Supp. at 1238-39.

Plaintiff suggests that the 2001 Plan and the Memorandum of Understanding contain mandatory language that qualifies Vertical's discretion in modifying the 2001 Plan. Specifically, the 2001 Plan states that over quota commissions "will be paid" for all revenue in excess of the annual sales quota target and that, the commission "is paid" once the employee achieves 100% of his 2001 quota target. (Pl.'s L.R. 56.1 at Ex. C, MAX 0003.) The 2001 Plan also states that employees "will be paid" monthly and quarterly revenue bonuses. (Pl.'s L.R. 56.1 at Ex. C,

MAX 0003-04.) In *Rakos*, the plaintiff claimed that "mandatory language in the [compensation] Plan such as a bonus 'will' be paid based on performance" was inconsistent with his employer's right to modify or rescind the compensation plan at any time and created ambiguities that could only be decided by the trier of fact. 954 F. Supp. at 1238. The *Rakos* court rejected that argument and found that "[t]he Plan in its entirety must be analyzed and it merely says that an employee will be paid bonuses unless defendant decides otherwise." *Id.* Persuaded by *Rakos*, this Court rejects Plaintiff's argument and continues to find that the 2001 Plan contains no firm offer or entitlement to a bonus.

Plaintiff also focuses on language in the Memorandum of Understanding that reads, "[Alves] will communicate any modifications to the revenue numbers with as much advance notice as possible." (Pl.'s L.R. 56.1 at Ex. C, MAX 0010.) Plaintiff suggests that this language creates ambiguity as to whether the 2001 Plan required that notice be given before Vertical could modify Plaintiff's target sales quotas. Because of this ambiguity, Plaintiff argues that Vertical's motion for summary judgment must be denied. The Court rejects Plaintiff's ambiguity argument. Far from creating an obligation, the language cited by Plaintiff actually reinforces Vertical's power to modify Plaintiff's sales quotas at will and merely suggests that Vertical intends to make a good faith effort to give Plaintiff notice if and when those changes are made. The language is not binding and it does not qualify the complete discretion retained by Vertical in the 2001 Plan. Analyzing the 2001 Plan in its entirety, the plan merely says that Plaintiff will be paid bonuses if and when he achieves the sales quotas set out by Vertical, unless Vertical decides otherwise.

Under the express terms of the 2001 Plan, Vertical did not make a binding offer to Plaintiff with regard to possible incentive compensation and it was not reasonable for Plaintiff to

believe that such an offer was made. It follows that Plaintiff did not have an enforceable contract with regard to the specific terms of his incentive compensation plan. Unable to enforce the specific terms of his incentive compensation contract, Plaintiff cannot prevail on his breach of contract claim. As Plaintiff raises no genuine issues of material fact, the Court grants Vertical's motion for summary judgment with regard to Count I.

### 2. Count II

In Count II, Plaintiff alleges that Vertical breached his employment contract by failing to comply with the 2002 Plan. According to Plaintiff, Vertical first waived its right to insist on strict performance of the 2002 Plan when it elected to pay Plaintiff a commission for a software subscription sale that did not involve "shipments," and then breached the 2002 Plan when it decided to credit him for that sale in sixty monthly installments, instead of a lump sum credit. Vertical rejects Plaintiff's claims and argues that, per the express language of the 2002 Plan, Vertical had the power to modify the plan at any time so there was no enforceable contract with regard to bonuses and Plaintiff had no right to claim guaranteed commission payments. Furthermore, Vertical claims that it never waived the 2002 Plan's "shipments" requirement, but rather voluntarily chose to reward Plaintiff as though the deal qualified for commissions by crediting his sales quota in sixty monthly installments, reflecting the manner in which the sale was accounted for per the Generally Accepted Accounting Principles ("GAAP").

The 2002 Plan contains the same disclaimers as the 2001 Plan. The "Plan Rules and Regulations" section of the 2002 Plan states:

*   *   *

c.      You do not have the right to receive incentive compensation unless you are in compliance with all of the terms and conditions of this plan.

d.      Vertical Networks has the sole right to resolve any question, interpretation, conflict, or other issue arising from or relating to this plan.

e.      Vertical Networks reserves the right to make any adjustments or revisions to your target incentive compensation, or any element of the plan at any time without prior notice.

f.      Vertical Networks management reserves the right, in its sole judgement, to withhold or reduce compensation, to a level appropriate or commensurate with your involvement in the quota opportunity.

(Defs.' L.R. 56.1 at Ex. P, MAX 0026-27.) As in the case of the 2001 Plan, Vertical retained the

right to modify or cancel Plaintiff's incentive commissions at any time, so Plaintiff cannot

enforce the specific terms of the incentive compensation contract. *See Schultz*, 1999 WL

988772, at *2-3; *Rakos*, 954 F. Supp. at 1237-38; *Grottkau*, 1995 WL 32611, at *21.

Furthermore, Vertical correctly argues that, even if the "shipments" requirement was waived, the

decision to pay Plaintiff in sixty installments would fall under Vertical's reserved right to

"resolve any question, interpretation, conflict, or other issue arising from or relating to this plan."

(Vertical's Mem. Supp. Mot. Summ. J. at 12.) Like the 2001 Plan, when analyzed in its entirety,

the 2002 Plan merely states that Plaintiff will be paid bonuses in the manner set out by Vertical,

unless Vertical decides otherwise.

Under the express terms of the 2002 Plan, Vertical did not make Plaintiff a binding offer

with respect to the specific terms of the incentive compensation plan and it was not reasonable

- 16 -

for Plaintiff to believe such an offer was made. It follows that Plaintiff cannot enforce the specific terms of the 2002 Plan. In the absence of an enforceable contract, Plaintiff cannot prevail on his breach of contract claim. As there are no genuine issues of material fact, the Court grants Vertical's motion for summary judgment with regard to Count II.

### 3. Counts III and IV

Plaintiff files Count III as an alternative claim to Count I and Count IV as an alternative claim to Count II. Both Counts III and IV state that, in the event the 2001 and 2002 Plans are not enforceable contracts, under the doctrines of quantum meruit and unjust enrichment Plaintiff is entitled to recover for the value of the services he provided to Vertical. Vertical rejects Plaintiff's claims and argues that Count III and Count IV should be dismissed because Plaintiff may not allege both that an existing contract addresses Plaintiff's compensation and that quasi-contractual claims cover that same subject matter.

Under Rule 8(e)(2) of the Federal Rules of Civil Procedure, Plaintiff was permitted to plead both breach of contract and quasi-contractual claims in his complaint. At summary judgment, however, the Court considers the merits of Plaintiff's claims and Plaintiff may no longer have the luxury of maintaining both contract and quasi-contractual claims.

The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests. *Murray v. ABT Assocs. Inc.*, 18 F.3d 1376, 1379 (7th Cir. 1994); *Watts v. Advance Transformer Co.*, No. 02 C 4603, 2002 WL 31356449, at *4 (N.D. Ill. Oct. 18, 2002); *United States v. Broadway Constr., Inc.*, No. 97 C 8284, 1998 WL 246385, at *5 (N.D. Ill. Apr. 24,

1998) ("The law does not allow the plaintiff to turn to quasi-contract as a means of shifting the risks it assumed under [contract]."); *Indus. Lift Truck Serv. Corp. v. Mitsubishi Int'l Corp.*, 432 N.E.2d 999, 1002-03 (Ill. App. Ct. 1982). At oral argument, Plaintiff admitted that the subject matter of this case is governed by contracts and that the real issue in this case concerns the meaning of the contracts' terms. The Court agrees. The issue in this case is not whether contracts address Plaintiff's compensation but whether Plaintiff has a legal right to enforce specific incentive packages or demand compensation based on those plans. At oral argument, the Court stated, "So there really is no way on earth that . . . you could maintain quasi-contract at the trial of the case," to which Plaintiff responded, "Agreed." Because Counts III and IV allege quasi-contractual claims that arise out of subject matter covered by contract, and because Plaintiff and Vertical agree that Count III and Count IV lack merit, the Court dismisses Count III and Count IV.

### 4.  Count VI

In Count VI, Plaintiff alleges that Vertical and Fraser violated the Illinois Wage Act by willfully failing to pay Plaintiff's commissions and bonuses under the 2001 and 2002 Plans. Plaintiff argues that Fraser may be held liable as if he were Plaintiff's employer because Fraser may have knowingly and willfully permitted Vertical to refuse payment to Plaintiff. (Pl.'s Compl. at 14.) Vertical rejects Plaintiff's claim and argues that no wages are owed Plaintiff and that the Illinois Wage Act does not apply in this case because Vertical is not an Illinois employer. Fraser argues that this Court lacks personal jurisdiction over him. In the event that personal

- 18 -

jurisdiction exists, Fraser incorporates Vertical's arguments and rejects Plaintiff's claim on the same grounds.

The Illinois Wage Act provides employees a cause of action for the timely and complete payment of earned wages or final compensation. This cause of action arises out of the employment contract. *Miller v. Kiefer Specialty Flooring, Inc.*, 739 N.E.2d 982, 986 (Ill. App. Ct. 2000). The Illinois Wage Act "applies to all employers and employees in this State . . . ." 820 ILCS 115/1. The Act purports to define "employers" and "employees" in 820 ILCS 115/2 but the definitions do not clarify whether employers or employees located outside of Illinois are subject to the Act. *See* 820 ILCS 115/2. The Act also provides that "[t]he Department of Labor shall be authorized to enter into agreements with other states to collect unpaid wages from out-of-state employers and to perform reciprocal services for such states in the State of Illinois." 820 ILCS 115/7.

Few courts have ruled on whether the Illinois Wage Act applies to out-of-state employers but those that have find that the Act applies to Illinois employers only. In *Glass v. Kemper Corp.*, 920 F. Supp. 928, 931 (N.D. Ill. 1996), and *Khan v. Van Remmen, Inc.*, 756 N.E.2d 902, 913 (Ill. App. Ct. 2001), the courts analyzed the language of the Act and found that it did not apply to out-of-state employees nor out-of-state employers. The *Glass* court focused on 820 ILCS 115/1 and determined that "in this State" is a prepositional phrase that acts as the adverb modifying the compound group "employers and employees." *Glass*, 920 F. Supp. at 931. Thus, as written, the Act requires that both employers and employees be located in Illinois. *Id.* Further, both *Glass* and *Khan* found that if employees could enforce the Illinois Wage Act across state lines, the section of the Act that authorizes the Illinois Department of Labor to enter into

agreements with other states would be unnecessary and invalid. *Glass*, 920 F. Supp. at 931; *Khan*, 756 N.E.2d at 913. Finally, both courts found that applying the Illinois Wage Act to out-of-state employers employing Illinois employees would constitute extraterritorial enforcement of an Illinois statute, violating the rule that an Illinois statute has no extraterritorial force and is operative only as to persons or things within Illinois. *Glass*, 920 F. Supp. at 932; *Khan*, 756 N.E.2d at 913. For these reasons both *Glass* and *Khan* held that, when looking at the Act as a whole, it is clear that the Illinois Wage Act applies only when both employer and employee are in Illinois. *Glass*, 920 F. Supp. at 932; *Khan*, 756 N.E.2d at 913.

The Court agrees with *Glass* and *Khan* and finds that the Illinois Wage Act does not provide an Illinois employee with a cause of action against an out-of-state employer. Vertical is based in California and is not an Illinois employer. It follows that Plaintiff cannot bring an Illinois Wage Act claim against Vertical so Count VI must be dismissed. Finally, even if the Act did provide Plaintiff with a cause of action, the Court would still dismiss Plaintiff's Count VI because (for the reasons stated above) the 2001 and 2002 Plans did not contain binding offers and Plaintiff cannot enforce the incentive commissions described in those plans. *See Miller*, 739 N.E.2d at 986 (cause of action under Illinois Wage Act arises out of employment contract). For these reasons Count VI against Vertical is dismissed. Furthermore, even if this Court has personal jurisdiction over Fraser, it appears that Count VI against Fraser must be dismissed, at the very least, due to Plaintiff's inability to enforce his incentive compensation plans.

## C.    Claims Against Fraser

### 1.    Counts VI and VII

#### a.    Personal jurisdiction was not waived.

Plaintiff's Counts VI and VII allege violation of the Illinois Wage Act and tortious interference with contracts against Fraser, Vertical's President and CEO, in his personal capacity. Fraser argues that he is not subject to personal jurisdiction in this forum. Plaintiff claims that Fraser waived his challenge to personal jurisdiction by participating in this litigation.

A federal district court exercising diversity jurisdiction has personal jurisdiction only if a court of the state in which it sits would have such jurisdiction. *RAR, Inc. v. Turner Diesel Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997). To determine whether personal jurisdiction exists in this case, the Court examines (1) Illinois statutory law, (2) Illinois constitutional law, and (3) federal constitutional law. Under Illinois statutory law, whether this Court has personal jurisdiction over Fraser is determined by the state's long-arm statute. 735 ILCS 5/2-209. The long-arm statute states that an Illinois court may exercise jurisdiction on any basis permitted by the state and federal constitution. 735 ILCS 5/2-209(c). Thus, the three tests mentioned above collapse into two constitutional inquiries—one state and one federal. *RAR, Inc.*, 107 F.3d at 1276.

The Illinois Supreme Court holds that Illinois' due process guarantee is not coextensive with the due process protection under the United States Constitution. *Rollins v. Ellwood*, 565 N.E.2d 1302, 1316 (Ill. 1990). However, the overlap between Illinois due process protection and federal due process protection is extensive and the Seventh Circuit has repeatedly tried in vain to find operative differences between the limits imposed by the Illinois Constitution and those imposed by the United States Constitution. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 715-16 (7th

Cir. 2002) (noting that in no post-*Rollins* case has an Illinois court found federal due process to allow the exercise of jurisdiction where Illinois limits prohibited it); *RAR, Inc.*, 107 F.3d at 1276-77 (same). Accordingly, in this case, if personal jurisdiction is found to exist under the United States Constitution the Court will consider personal jurisdiction to exist under Illinois constitutional law as well.

The Due Process Clause of the United States Constitution permits an Illinois court to exercise jurisdiction over non-resident individuals and corporations only where the defendant has certain minimum contacts with the state such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Weyent*, 2004 WL 421745, at *1. What that standard means in a particular case depends on whether the state court asserts general or specific jurisdiction. General jurisdiction is permitted only where the defendant has continuous and systematic general business contacts with the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984). Specific jurisdiction refers to jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum. *Id.* at 414-15; *RAR, Inc.*, 107 F.3d at 1277. Specific jurisdiction exists where the defendant has purposefully established minimum contacts within the forum state such that the defendant "should reasonably anticipate being haled into court [in that forum]." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (internal citations omitted); *Hyatt Int'l Corp.*, 302 F.3d at 716.

Fraser argues that this Court cannot assert general or specific personal jurisdiction over him. In order to challenge personal jurisdiction, per Rule 12(h) of the Federal Rules of Civil Procedure, Fraser was required to include objections to personal jurisdiction in his answer and/or

motions when responding to Plaintiff's complaint. Fed. R. Civ. P. 12(h)(1). While including the objection in the original answer is required, that act alone may not be enough to preserve Fraser's objection to jurisdiction indefinitely. A party who initially objects to jurisdiction, may waive the objection by participating in litigation. *Cent. States, S.E. & S.W. Areas Pension Fund v. Wiseway Motor Freight, Inc.*, No. 99 C 4202, 2000 WL 1409825, at *4 (N.D. Ill. Sept. 26, 2000). For example, a party who files a summary judgment motion on the merits of the case may waive personal jurisdiction objections. *Id.* Additionally, the more time the parties spend in litigation, the greater the likelihood that personal jurisdiction may have been waived. *See Cont'l Bank, N.A. v. Meyer*, 10 F.3d 1293, 1297 (7th Cir. 1993).

Fraser objected to personal jurisdiction in his answer. Specifically, Fraser's Answer reads:

> Defendant Fraser denies that he is subject to personal jurisdiction in this district and specifically objects to the exercise of jurisdiction over him, including for those reasons set forth in Fraser's 12(b)(2) Motion to Dismiss in the case of Weyant v. Vertical Networks, Inc. and Fraser, No. 03 C 4214, which Fraser fully incorporates herein.

(Fraser's Ans. at 4.) Fraser did not delay in reraising the issue. As noted in Fraser's Answer, Fraser filed a motion to dismiss for lack of personal jurisdiction in Weyant's case, and Fraser and Plaintiff both agreed that making the same arguments at the same time in this case would be duplicative, wasteful, and pointless. Accordingly, the parties waited for a decision on Fraser's motion to dismiss Weyant's claims before proceeding in this case. Thus, while litigation in this case began in August 2003, elements of the litigation pertaining to Fraser's personal jurisdiction objections were stayed by the parties pending the outcome of Fraser's motion in the companion case filed by Weyant. After that delay—culminating in the denial of Fraser's motion to dismiss on

- 23 -

February 3, 2004–the parties resumed litigating this case, with Fraser continuing to voice his objection to personal jurisdiction. Given the circumstances surrounding the two companion cases, including identical counsel, claims and parties, the fact that seven months passed before Fraser renewed his objections to personal jurisdiction in this case does not justify waiver. Thus, the Court finds that Fraser has not waived his personal jurisdiction defense. Furthermore, the fact that Fraser lost his motion to dismiss Weyant's claims does not mean that personal jurisdiction exists in this case, as motions to dismiss are subject to liberal pleadings standards and not the factual substance of the claims which confronts us here.

Plaintiff argues that Fraser waived personal jurisdiction by filing a motion for summary judgment and by participating in merits discovery. A defendant who objects to personal jurisdiction in his answer but does not reraise his objections as he fully participates in litigation on the merits of the case waives personal jurisdiction objections. *Cont'l Bank, N.A.*, 10 F.3d at 1297 (participating fully in litigation on merits for over two years resulted in waiver); *Cent. States, S.E. & S.W. Areas Pension Fund*, 2000 WL 1409825, at *4. Fraser, however, has continuously objected to personal jurisdiction and participated in depositions and interrogatories only as they pertained to his personal jurisdiction objection or as they pertained to his actions and responsibilities as a corporate officer of Vertical, not in his individual capacity. Fraser's participation does not suggest that he is actively litigating Plaintiff's claims against him on the merits, nor that he is failing to comply with the spirit of Rule 12(h). Fraser's summary judgment motion now before the Court focuses on Fraser's personal jurisdiction objections, and implicates the merits of Plaintiff's claims only to the extent necessary to show that this forum lacks personal

jurisdiction over Fraser. Accordingly, Fraser has not waived his personal jurisdiction objection by filing the present motion for summary judgment.

Plaintiff suggests that Fraser's decision not to file a motion to dismiss in this case manifests an intent to submit to this Court's jurisdiction. (Pl.'s Resp. Fraser's Mot. at 3.) Plaintiff argues that, "Fraser did not explain then or now why he did not or could not file a similar motion in this Court prior to filing the present motion for summary judgment." (Id.) This is incorrect. Fraser made clear that it did not make sense for him to file a second motion to dismiss while such a motion was pending in the *Weyent* case. Furthermore, Fraser is entitled to pursue whatever litigation strategy he prefers; he need not file a motion to dismiss if he believes he will be more successful with a motion for summary judgment. The Court does not consider Fraser's delay or litigation strategy to be evidence of waiver.

Plaintiff next cites to Rule 56(f) of the Federal Rules of Civil Procedure and argues that Fraser's summary judgment motion is premature and should be denied because Plaintiff has not had an opportunity to conduct depositions regarding personal jurisdiction, i.e., Fraser's contacts with Illinois, or to otherwise collect information essential to his opposition to Fraser's motion. (Pl.'s Resp. Fraser's Mot. at 3-4.) Under Rule 56(f), where a party opposing a motion for summary judgment submits an affidavit explaining that he cannot present by affidavit facts essential to justify his opposition the Court may refuse the application for judgment or order a continuance to allow for further discovery. Fed. R. Civ. P. 56(f). Thus, Rule 56(f) operates to postpone summary judgment until the record is more fully developed and the opposing party has adequate opportunity to conduct discovery. *Grayson v. O'Neill*, 308 F.3d 808, 815 (7th Cir. 2002); *Farmer v. Brennan*, 81 F.3d 1444, 1449 (7th Cir. 1996).

- 25 -

Rule 56(f) does not apply to this case. In his declaration, Plaintiff claims that he reasonably believed that Fraser had waived his personal jurisdiction objection because Fraser lost his motion to dismiss in *Weyent* and did not indicate to Plaintiff that he intended to continue challenging personal jurisdiction in this case. (Pl.'s Resp. Fraser's Mot. at Ex. 3.) Because he did not expect Fraser to raise this objection, Plaintiff claims that he had no opportunity in this case to pursue discovery on the issue of personal jurisdiction. (Id.) The Court is not persuaded by these arguments. On July 21, 2004, Plaintiff deposed Fraser on a variety of issues and had opportunities to conduct discovery on personal jurisdiction. In fact, Plaintiff's attorney deposed Fraser and obtained written discovery on the personal jurisdiction issue for Weyant's case. Because Fraser continuously objected to personal jurisdiction and because Plaintiff had every opportunity to depose Fraser or otherwise obtain discovery on the personal jurisdiction issue, the Court rejects Plaintiff's Rule 56(f) argument.

For the reasons stated above, the Court finds that Fraser has not waived his objection to personal jurisdiction and he should not be prevented from raising this challenge in his motion for summary judgment.

> b. The Court cannot assert general personal jurisdiction over Fraser.

As an initial matter, the Court finds that general personal jurisdiction does not exist in this case. General personal jurisdiction relies on ongoing and continuous contact with the State of Illinois. Ongoing and continuous means such regularity that the defendant practically resides in the forum state. *Helicopteros Nacionales de Colombia, S.A.*, 486 U.S. at 415-16. Such

extensive contacts are not present in this case. Fraser clearly states in his declaration that his

contacts with the State of Illinois were minimal and exclusively on behalf of Vertical. (Fraser's

Decl. ¶¶ 6-8.) Fraser states that throughout his entire employment with Vertical he was based in

California. (Fraser's Decl. ¶ 4.) Furthermore, Fraser has never been a resident or citizen of

Illinois, never owned real estate in Illinois, and has never maintained a place of business, been

liable for income tax, voted, or owned bank accounts in Illinois. (Fraser's Decl. ¶¶ 9-14.) In his

complaint, Plaintiff states "on information and belief, Fraser has often traveled to Illinois for the

Household purchase order described below, and for other reasons, and those contacts and visits,

among others, have further subjected him to specific and/or general personal jurisdiction for this

action." (Pl.'s Complaint ¶ 7.) This unsupported allegation is insufficient to create personal

jurisdiction at summary judgment. Because there is no evidence to suggest that Fraser's contacts

with the State of Illinois were more than minimal the Court cannot assert general personal

jurisdiction over Fraser.

                    c.      The Court cannot assert specific jurisdiction
                            over Fraser.

        Plaintiff argues that specific personal jurisdiction exists in this case because Illinois Wage

Act violations and torts against an Illinois resident arose out of Fraser's few contacts with Illinois.

Accordingly, Plaintiff claims that sufficient minimum contacts and substantial justice and fair

play create specific personal jurisdiction over Fraser. Fraser does not deny that he came to

Illinois on a few occasions in conjunction with the Household deal, (Fraser's Mem. Supp. Mot.

Summ. J. at 8), but he claims the trips to Illinois were made on behalf of his employer, Vertical,

and not in his individual capacity. Fraser claims that these contacts with Illinois do not satisfy the minimum contacts necessary under federal due process law because of Illinois' fiduciary shield doctrine.

Illinois' fiduciary shield doctrine is a judicially created principle that precludes the exercise of personal jurisdiction over a non-resident corporate agent or employee who is acting in the forum state in his role as corporate agent or employee. *Allman v. McGann*, No. 02 C 7442, 2003 WL 1811531, at *6 (N.D. Ill. Apr. 4, 2003). The fiduciary shield doctrine is premised on the rationale that, where a corporate agent's contact with Illinois was made only on behalf of his employer, it would unfair, unjust, and unreasonable to assert jurisdiction over him based on those contacts. *Id*; *Glass v. Kemper Corp.*, 930 F. Supp. 332, 342 (N.D. Ill. 1996). The Illinois Supreme Court recognized the fiduciary shield doctrine in *Rollins v. Ellwood.* 565 N.E.2d at 1317-18. In explaining the doctrine and its legal underpinning, the Illinois Supreme Court indicated:

> Thus, we find it to be unfair and unreasonable, under Illinois' due process clause and the tenets of our concept of the jurisdictional power of the Illinois courts, to assert personal jurisdiction over an individual who seeks the protection and benefits of Illinois law, not to serve his personal interests, but to serve those of his employer or principal.

*Id*. at 1318. There are exceptions to the fiduciary shield doctrine. In the Northern District of Illinois, the fiduciary shield doctrine may be lifted where the corporate officer acted to serve his own personal interests; where the corporate officer is the alter ego of the corporation for which he is a fiduciary; and, possibly, where the corporate officer had discretion regarding whether the contacts occurred. *Allman*, 2003 WL 1811531, at *6; *Robinson v. Sabis Educ. Sys., Inc.*, No. 98 C 4251, 1999 WL 412642, at *3 (N.D. Ill. May 28, 1999).

The fiduciary shield doctrine applies in this case. Fraser's contacts with Illinois were made on behalf of Vertical and in his capacity as a corporate officer. (Fraser's Decl. ¶¶ 6, 8.) There is no evidence to suggest that Fraser's contacts concerned anything other than the Household deal and contract work for Vertical. At all relevant times, it appears that Fraser was working as Vertical's President and CEO. (Fraser's Decl. ¶¶ 6-8.) Furthermore, Fraser stated that he does not recall ever being present in Illinois when discussing Plaintiff's claims for alleged unpaid commissions or bonuses. (Fraser's Decl. ¶ 7.) Accordingly, the fiduciary shield doctrine applies to Fraser's Illinois contacts unless grounds exist for lifting the shield.

The fiduciary shield should not be lifted in this case. There is no evidence that Fraser's activities with regard to Plaintiff, Household or Illinois served Fraser's personal interests, nor that Fraser played any role in determining whether contacts with Illinois occurred. Fraser's trips were made on behalf of Vertical. Fraser did not draft or negotiate the 2001 Plan or 2002 Plan with Plaintiff. (Pl.'s Resp. L.R. 56.1 ¶ 116.) Rather, Alves and Mares were responsible for finalizing individual compensation plans, including Plaintiff's. (Pl.'s Resp. L.R. 56.1 ¶ 119.) And Alves and Mares were responsible for implementing and administering the compensation plans. (Pl.'s Resp. L.R. 56.1 ¶ 121.) In fact, Fraser stated that he had no direct knowledge of any of the adjustments made to Plaintiff's plan as a result of the Household deal, (Fraser Dep. at 45, 49), and that Alves and Mares, and later Mark Phillips (Vertical's Controller), were responsible for determining the commissions payable to Plaintiff. (Mares Dep. at 54, 56.) Furthermore, Fraser claimed that he did not specifically tell anybody not to pay Plaintiff any amount. (Fraser Dep. at 53.) With regard to the 2002 Plan, all agree that Phillips, not Fraser, was responsible for the

decision to credit Plaintiff with the $1.4 million subscription sale over the course of sixty months. (Pl.'s Resp. L.R. 56.1 ¶ 128-29.)

Plaintiff argues in favor of lifting the fiduciary shield doctrine but presents no evidence to support his claims. Plaintiff points out that Fraser had final authority to decide any compensation issue raised by a Vertical employee, including whether the Household deal would be treated outside of Plaintiff's 2001 Plan. Plaintiff also rejects Fraser's claim that he simply signed off on documents prepared by Alves and Mares that modified Plaintiff's 2001 Plan because Fraser stated in his deposition that Mares requested approval for the changes and Fraser approved them. (Fraser Dep. at 66-70.) Plaintiff's arguments fail, as the mere fact that Fraser was in a position of authority does not mean that he acted for his own personal benefit nor that he exercised his discretion to carry out actions in the State of Illinois.

Plaintiff continues to rely on unsupported allegations of wrongdoing, which is insufficient to create a genuine issue of material fact at summary judgment. There is no evidence warranting the lifting of the fiduciary shield doctrine, so that doctrine applies in this case. Fraser's contacts with Illinois were on behalf of Vertical and were not sufficient to create personal jurisdiction. Accordingly, Plaintiff's Counts VI and VII against Fraser, alleging violation of the Illinois Wage Act and tortious interference with contracts, fail for lack of personal jurisdiction in this forum and are denied.

d.      Plaintiff's Counts VI and VII against Fraser lack merit.

While this Court lacks personal jurisdiction over Fraser, Plaintiff's Counts VI and VII against Fraser would fail on the merits anyway. Plaintiff's Count VI against Fraser fails for the

same reasons Plaintiff's Count VI against Vertical fail. Fraser resides and works in California and is not an Illinois employer and is not subject to the Illinois Wage Act. Furthermore, Plaintiff cannot enforce the specific terms of the incentive compensation plans at issue, so the contracts cannot be enforced and are not protected by the Illinois Wage Act. Thus, the Act does not apply in this case, nor has it been violated (and certainly not in a manner constituting a tort). It follows that Count VI against Fraser must be dismissed.

Plaintiff's Count VII tortious interference claim fails as well. In Count VII, Plaintiff alleges tortious interference with contracts. This tort requires showing: (1) the existence of a legally enforceable contract, (2) defendant's knowledge of that contract, (3) defendant's intentional interference inducing a breach by a party to the contract, and (4) damages. *Stafford v. Puro*, 63 F.3d 1436, 1441 (7th Cir. 1995). Illinois courts hold that where the defendant's conduct is privileged, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious. "Malice" is defined as intentional and without justification. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 677-78 (Ill. 1989).

Illinois courts recognize a privilege for corporate officers accused of tortious interference with contracts. This privilege exists in order to allow corporate executives to exercise discretion and business judgment on behalf of the corporation. *Id.* at 677. There is no privilege for corporate officers who act solely for their own benefit or solely in order to injure an employee because such conduct is contrary to the best interests of the corporation. *Stafford*, 63 F.3d at 1442.

The corporate officer's privilege applies in this case as Fraser is a corporate officer of Vertical and the alleged interference involved a contract with an employee of Vertical. It follows

- 31 -

that Plaintiff must produce some evidence of actual malice, in addition to the elements of tortious interference with contracts, to avoid summary judgment. *HPI Health Care Servs.*, 545 N.E.2d at 677-78. This Plaintiff cannot do. As discussed above, Plaintiff cannot enforce the terms of his 2001 or 2002 incentive compensation contract. Next, Plaintiff presents no evidence that Fraser was personally motivated to unjustifiably interfere with Plaintiff's contract, nor that Fraser played a significant or otherwise unusual role in the ultimate decisions being made with regard to Plaintiff's compensation. *See Allman*, 2003 WL 1811531, at *7 (granting motion to dismiss because the plaintiff's allegations of purposeful, willful and malicious interference with contracts did not amount to allegations of personal interest). Plaintiff has not established the elements necessary for showing tortious interference with contracts so Count VII must fail.

Plaintiff cites to *Stafford v. Puro* and argues that violating the Illinois Wage Act is a crime and therefore satisfies the malice requirement for tortious interference. In *Stafford*, several corporate officers admitted owing the plaintiff money for years but they refused to pay him, fired him, and then offered to pay some of the money owed if the plaintiff waived other claims against them. 63 F.3d at 1439. The case went to trial and a jury found the officers liable for violating the Illinois Wage Act and for tortiously interfering with the plaintiff's contract agreement. *Id.* at 1440. On appeal, the defendants argued that a finding of liability under the Illinois Wage Act cannot also constitute a tort. *Id.* at 1442. The Seventh Circuit disagreed and cited *HPI Health Care Servs.* for the proposition that a plaintiff facing a motion to dismiss could satisfy the malice requirement with allegations of illegal conduct. *Id.* Thus, in the Seventh Circuit, an allegation of illegal conduct may constitute an allegation of actual malice. There is no basis, however, for concluding that a violation of the Illinois Wage Act is per se tortious. At motion for summary

judgment, Plaintiff's mere allegations of illegal conduct are insufficient and do not create a genuine issue of material fact.

Plaintiff relies on allegations of Illinois Wage Act violations to prevail on his tortious interference with contracts claim. However, as discussed above, Plaintiff cannot enforce the specific terms of his 2001 or 2002 Plan and the Illinois Wage Act does not even apply to Plaintiff's employer Vertical, let alone Fraser in his individual capacity.[4] No evidence of egregious or tortious behavior by Fraser has been presented and there is no evidence of actual malice. It follows that Plaintiff's Count VII must fail.

### III. Conclusion

For the reasons stated above, Vertical's and Fraser's motions for summary judgment are granted.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
Dated: March 18, 2005.                    United States Magistrate Judge

---

[4] Under the Illinois Wage Act, a corporate officer who knowingly permits a violation of the Act shall be deemed an employer of the corporation's employees. 820 ILCS 115/13. However, as Plaintiff cannot enforce his incentive compensation contracts and the Act does not apply to out-of-state employers like Vertical, no violations of the Act have occurred and 820 ILCS 115/13 is not implicated.

- 33 -

Copies have been mailed to:

SUSAN E. WALSH, Esq.                    EUGENE A. BOYLE, Esq.
Freeborn & Peters                       WILLIAM J. TARNOW, Esq.
311 South Wacker Drive                  Neal, Gerber & Eisenberg, L.L.P.
Suite 3000                              Two North LaSalle Street
Chicago, IL  60606                      Suite 2200
                                        Chicago, IL  60602-3801

Attorney for Plaintiff                  Attorneys for Defendants